UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

       v.                       1:10-cr-268

JERRY ROBBINS, a/k/a JERRY ROBINS,
d/b/a FINISH LINE AUTO SALES, a/k/a
FINISH LINE AUTO,

                          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS J. McAVOY
Senior United States District Judge

## DECISION and ORDER

Presently before the Court is Defendant's motion for acquittal, dkt. # 157, in this matter involving allegations that Defendant laundered money for drug dealers by selling them automobiles and violated laws regarding the reporting of cash transactions greater than $10,000.  The parties have briefed the issues.

## II.    BACKGROUND

The government charged Defendant Jerry Robbins in a twenty-six count indictment on September 15, 2010.  See dkt. # 1.  Generally, the government alleged that Defendant laundered money for drug dealers through his business, Finish Line Auto Sales.  According to the government, Defendant sold automobiles to persons he knew to be drug dealers for cash, titled those vehicles in the names of third parties, and then failed to file currency reports mandated by federal law for cash transactions of more than $10,000.  Such practices, the government alleges, were a means by which persons engaged in illegal drug

sales could dispose of the cash from those sales and make the money appear to come from a legitimate source.

Count 1 of the indictment charged Defendant with conspiracy to engage in money laundering.  Count 2 alleged money laundering in a sale to an undercover officer.  Counts 3 through 9 charged money laundering with respect to specific transactions.  The indictment listed a particular vehicle, purchase price, and date of transaction, but alleged that the criminal conduct was of the same type for each transaction.  Counts 10 through 16 charged defendant with engaging in monetary transactions within the United States involving property valued greater than $10,000 which was derived from a specified unlawful activity.  The government also charged Defendant with aiding and abetting on Counts 3 through 16.  Counts 17 through 25 charged Defendant with violating certain laws related to reporting cash transactions over $10,000.  Each of those counts referenced specific transactions.  Count 26 charged the defendant with violating laws prohibiting the destruction of property subject to seizure.

After a trial, the jury returned a verdict of guilty against Defendant on Counts 3, 7, 8, 17, 19, 24 and 25.  The jury acquitted the Defendant on all other Counts.  Defendant then filed the instant motion for acquittal, challenging his conviction on various grounds.  The government has replied to the motion, bringing the case to its present posture.

## II.    ANALYSIS

Defendant seeks acquittal on each of the Counts on which he was convicted, citing various grounds.  The Court will address in turn.

### A.  Sufficiency of the Evidence

Defendant challenges the sufficiency of the evidence to convict him pursuant to Federal Rule of Criminal Procedure 29(c).  "A defendant challenging a conviction based on sufficiency grounds bears a heavy burden."  United States v. Desena, 260 F.3d 150, 154 (2d Cir. 2001).  A Court is required to "'uphold a conviction if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  United States v. Bicaksizu, 194 F.3d 390, 398 (2d Cir. 1999) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original)).   The Court must "consider the evidence in a light most favorable to the government, . . . draw all permissible inferences in the government's favor and . . . favor the jury's verdict in resolving all issues of credibility."  United States v. Singh, 390 F.3d 168, 187 (2d Cir. 2004).  The Defendant "bears the burden of demonstrating the inadequacy of the evidence[.]"  United States v. Kavoukian, 354 F.3d 117, 120 (2d Cir. 2003).  The Court is to "be careful to avoid usurping the role of the jury."  United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999).  "Rule 29(c) does not provide the trial court with an opportunity to 'substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury.'"  Id. (quoting Curley v. United States, 160 F.2d 229, 232 (D.C. Cir. 1947)).

Much of the evidence presented at trial in this matter was circumstantial. "Circumstantial evidence can be as compelling as direct evidence and a conviction can rest solely on circumstantial evidence."  United States v. Glenn, 312 F.3d 58, 70 (2d Cir. 2002). Indeed, "the strength of a particular piece of evidence turns on the specific circumstances that accompany the evidence."  Id.   Nearly "'all evidence must involve an inference from some fact to the proposition to be proved.'"  Id. (quoting Henry Wigmore, WIGMORE ON EVIDENCE § 25 (Tillers rev. 1983)).  "When making a case based on circumstantial evidence,

the government need not 'exclude every reasonable hypothesis other than that of guilt.'"

Guadagna, 183 F.3d at 130 (quoting Holland v. United States, 348 U.S. 121, 139 (1954)).

Thus, "the court may enter a judgment of acquittal only if the evidence that the defendant

committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find

guilt beyond a reasonable doubt.'" Id. (quoting United States v. White, 673 F.2d 299, 301

(10th Cir. 1982)).  A court is to "consider the evidence in its totality, not in isolation, and the

government need not negate every theory of innocence."  United States v. Autouori, 212 F.3d

105, 114 (2d Cir. 2000).

Defendant argues that the evidence was insufficient to convict him on Counts 3, 7

and 8 of the indictment.  All of those counts relate to violation of 21 U.S.C. § 841(a)(1) and

conspiracy to violate that section.  The indictment alleges that Defendant

> did knowingly conduct, and attempt to conduct, financial transactions, namely, the transfer, delivery and disposition of monetary instruments, namely, United States currency, and the transfer of title to vehicles . . . which financial transactions affected interstate commerce, and which involved the proceeds of specified unlawful activity, namely, the distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), and conspiracy to do so, in violation of Title 21, United States Code, Section 846, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of said specified unlawful activity and to avoid a transaction reporting requirement under Federal law, namely, the transaction reporting requirements as set forth in Title 31, United States Code, Section 5331(a), and the regulations promulgated thereunder, including Title 31, Code of Federal Regulations, Section 103.30, and knowing that the property involved in such financial transactions, namely, the said United States currency, represented the proceeds of some form of unlawful activity.

See dkt. # 1.  Count 3 concerned the sale of a 2001 GMC Yukon for $25,000 on February

27, 2006.  Count 7 concerned the sale of a 2002 Chevrolet Suburban for $10,820 on April

27, 2007.  Count 8 concerned the sale of a 2004 Infiniti QX 56 for $34,455 on June 9, 2007.

Defendant contends that the evidence presented at trial was insufficient for a jury to find that

the vehicles in question were purchased with drug money or that Defendant knew that the

vehicles were purchased using such funds.  As such, he insists, his motion for acquittal

should be granted.

Section 1956 of Title 18, United States Code, deals with participation in a financial

transaction that involves property constituting the proceeds of specified unlawful activity.

Section 1956(a)(1)(B) provides that:

> Whoever, knowing that the property involved in a financial transaction represents
> the proceeds of some form of unlawful activity, conducts or attempts to conduct
> such a financial transaction which in fact involves the proceeds of specified
> unlawful activity–
>
> > (B) knowing that the transaction is designed in whole or in part-
> >
> > > (i) to conceal or disguise the nature, the location, the source, the
> > > ownership, or the control of the proceeds of specified unlawful activity; or
> > > (ii) to avoid a transaction reporting requirement under State or Federal law
> > > [is guilty of a crime].

18 U.S.C. 1956(a)(1)(B).   Thus, the government needed to show that (1) the Defendant

engaged in a financial transaction involving the proceeds of an illegal activity; (2) that the

Defendant knew that the property involved was the proceeds of an illegal activity; and (3)

that the Defendant knew that the transaction was designed to conceal the source of the

funds or avoid a reporting requirement.  See, e.g., United States v. Maher, 108 F.3d 1513,

1527-28 (2d Cir. 1997).  Defendant's argument here is that "there was no testimony or

evidence presented that" the automobiles were purchased with "drug money or that

Defendant knew" that the vehicles were purchased with "drug money."  Defendant thus

disputes the sufficiency of the proof that the proceeds used to purchase the automobiles

came from drug dealing and that he was aware that the proceeds came from drug dealing.

The Court will address the evidence supporting each count in turn.  In proving that the funds for the vehicles came from drug sales, the government did not have to prove that the funds came from a particular sale of narcotics, but instead needed to produce "sufficient circumstantial evidence" to prove that the funds were from the proceeds of drug sales "beyond a reasonable doubt."  U.S. v. Blackman, 897 F.2d 309, 316-17 (8th Cir. 1990).   In proving that the Defendant knew that the vehicles were purchased with drug money, "the government need not establish that [the purchaser] expressly stated that the [funds in question] constituted drug proceeds, provided that the totality of the circumstances, as revealed by all the evidence, would lead a reasonable person to draw that conclusion."  United States v. Portalla, 496 F.3d 23, 29 (1st Cir. 2007); United States v. Castellini, 392 F.3d 35, 46 (1st Cir. 2005) (defendant's knowledge of illegal activity can be found when a "natural inference" can be drawn by the defendant about the nature of the activity from the facts and circumstances); United States v. Kaufmann, 985 F.2d 884, 893 (7th Cir. 1993) (evidence was sufficient that Defendant believed cash used to purchase automobile was proceeds from drug sales, even though he was not told that directly because "there were . . . statements of various facts from which a reasonable person would almost certainly infer that drug proceeds were involved.").

As to Count 3, the government introduced the testimony of Thomas Adams.  See dkt. # 159.  Adams testified that his son, Robert DeWitt Stevenson, had asked him to purchase a motor vehicle for him in February 2006.  Id. at 2-3.  According to Adams, Stevenson asked him to put the car in Adams' name because Stevenson "didn't want to put it in his name and probably because it was he didn't want to–he was–it was through selling drugs."  Id. at 3.  Adams testified that Stevenson was selling drugs at the time of the

purchase. Id.  Stevenson brought Adams the title to the car, which he signed. Id. at 4.  At

the time, Adams was not working and his only income came from Social Security disability.

Id.  Adams never even went to the dealership to sign this paper. Id.  He denied that a

signature on a document also signed by the Defendant was his signature. Id. at 5.  He did

not recall providing a copy of his license for anyone to photocopy, and assumed that his son

had taken it. Id. at 6.  His son paid for the insurance Adams put on the car. Id. at 7.  The

money to purchase the car came from selling drugs, Adams testified. Id. at 8.  Adams did

not pay a dime of his own for the car, he never met Jerry Robbins, and he had never heard

of Finish Line Auto. Id. at 8-9.

Stevenson also testified about his purchase of the automobile. See dkt. # 161.

Stevenson testified that he had known the Defendant "since childhood." Id. at 19. He had

never discussed drug dealing with him, however. Id.  At the same time, Stevenson testified

that he had sold drugs to the public in the neighborhood, as well as out of his bar. Id. at 20-

21.  Stevenson also admitted that he had been arrested in 2007 for selling crack cocaine.

Id. at 3-4. Stevenson had been selling drugs from 1993 until his 2007 indictment. Id. at 9.

During that period, Stevenson testified that he made his living by selling drugs. Id. at 9-10.

He owned a bar, but supported the bar through his drug sales. Id. at 10.  Stevenson testified

that he purchased items like jewelry and cars with money from drug sales as a way of hiding

that money. Id.  He had Adams purchase the items for him. Id. at 11.

Stevenson testified that he decided to purchase the automobile referenced in

Count 3 on or about February 27, 2006 when he drove by Defendant's business and saw a

vehicle he liked. Id. at 11.  Stevenson went into the store, "talked to [Defendant] Jerry

Robbins" and agreed to purchase the vehicle for $25,000. Id. at 12.  He would pay $15,000

in cash and $10,000 in payments.  Id. at 13.  Stevenson went home to get the $15,000 he

needed and returned, telling Defendant he would "give him the 10,000 later."  Id. at 13-14.

Stevenson put the vehicle in Adams' name, telling Defendant he intended to do so.  Id.  at

14.  He did not tell Defendant why he wanted that arrangement.  Id.  Stevenson arranged the

purchase with Defendant and paid him the money.  Id. at 16.  He paid Defendant the

remaining $10,000 about a week later.  Id. at 17.  The money he used to buy the truck came

from selling cocaine.  Id. at 17.   Adams was not even present when he purchased the car.

Id. at 26.

        The Court finds that this evidence supports Defendant's conviction on Count 3.  If

the jury believed the testimony of Adams and Stevenson, the jury could reasonably conclude

that the money used to purchase the vehicle in question came from the sale of cocaine; both

men testified that it did.  As to Defendant's second argument, the circumstantial evidence in

the case could lead a reasonable jury to find that Defendant knew that the funds for the

transaction came from drug sales.  The testimony indicated that the purported purchaser of

the car had no actual connection to the purchase of the car.  The jury could also conclude

from the circumstantial evidence at trial that Stevenson, the actual purchaser, was known in

the community and to Defendant as a drug dealer.  The fact that he was not told directly that

the funds came from such activity does not prevent the jury from coming to that reasonable

conclusion.  Finally, the evidence is clear that Stevenson sought to conceal the source of the

funds for the car.  He titled the car in Adams' name, and Defendant was well-aware that the

cash paid for the car did not come from that person.  A jury could reasonably conclude that

the purpose of that transaction was to hide the source of the funds.  The Defendant's motion

is denied as to this Count.

Defendant also challenges his conviction on Count 7.  Jerome Davis testified to the purchase of the vehicle implicated in this Count.  See dkt. # 166.  Davis testified that he lived in the same neighborhood as defendant for about ten years.  Id. at 3.  Davis knew that Defendant sold cars at Finish Line Auto, and purchased "three or four" cars from him there.  Id. at 4.  He did not purchase those cars under his name, but under the name of Tameca Love, his fiancé.  Id.  On approximately April 24, 2007, Davis purchased a 2007 Chevrolet Suburban from Defendant for Love.  Id. at 5.  Davis purchased the car at an auction, but had Defendant bid on the car for him.  Id. at 6.  Defendant bought the vehicle and Davis paid him $100-150 for his assistance.  Id. at 7.  Davis' girlfriend Love then went and signed all of the paperwork related to the car.  Id. at 8.  The car was titled in her name.  Id. at 10.  In the end, Davis paid Defendant $10,500 plus the fees for the vehicle.  Id. at 9-10.  No testimony indicates that he signed any form regarding cash transactions.  Davis also testified that he had been convicted and served jail time in drug-related matters.  Id. at 10-12.  He denied, however, that the money used to purchase the automobile came from "an illegal source."  Id. at 14.

Tameca Love testified that Davis purchased the vehicle for her, but asked her to go to Defendant's business and place the vehicle in her name.  See dkt. # 165, at 3-4.  She went by herself to the business to sign the bill of sale.  Id. at 5.  She was unaware whether the car had been paid for when she singed the paperwork; Davis "took care of all of that."  Id.  She did not know how much money was actually paid to purchase the car.  Id. at 11.  Her signature appeared on two different bills of sale, one for $9,200 and one for $8,900.  Id. at 7-10.  With tax added to the price of the vehicle on each of the bills of sale, the first bill came out to more than $10,000 and the second bill less.  Id. at 19-20.  On cross-examination, Love

denied that either she or Davis were drug dealers.  Id. at 13.  She contended that the $6,000

she provided to help purchase the vehicle came from her savings and the work she did as a

Certified Nurse's Assistant.  Id. at 13.  On redirect, however, Love testified that Davis had

"asked me to withdraw $6,000" for the vehicle.  She also testified that Jerome Davis had

legitimate income from a construction business he ran.  Id. at  14.

   The Court will deny the Defendant's motion with respect to Count 7 as well.  While

there are fewer direct statements connecting the funds used to purchase the vehicle with

illegal drug sales, a rational trier of fact could have found circumstantial evidence supporting

an inference that these transactions, which followed the pattern of other transactions in this

case, were funded by illegal activity.  The jury had evidence that Davis was connected to

drugs.  Though Davis negotiated the purchase and provided Defendant with the funds for the

vehicle, Davis had Love title the vehicle in her name, erasing any documentation of his

connection to the sale.  The jury could also have reasonably concluded that the two bills of

sale demonstrated the purpose of the transaction, since the price difference between the two

sales allowed Defendant to avoid a cash-transaction reporting requirement.  The amount of

that sale was also less than the amount that Davis testified he paid for the vehicle. The jury

could also certainly have seen this subterfuge as an effort to avoid a reporting requirement.

"[C]onsidering the evidence in a light most favorable to the government, . . . draw[ing] all

permissible inferences in the government's favor and . . . favor[ing] the jury's verdict in

resolving all issues of credibility," the Court finds that the motion must be denied with respect

to this Count.  Singh, 390 F.3d at 187.

   Defendant also contests the sufficiency of the evidence to convict him on Count 8

of the indictment, which implicated the purchase of a 2004 Infiniti QX56.  Latese Mitchell

testified concerning this purchase and another purchase that involved Henry Lloyd, a man with whom she had a relationship in 2007. See dkt. # 158, at 2-3. Mitchell testified that in March 2007 she was asked to put a Windstar minivan in her name. Id. at 3. The car was purchased at Defendant's business. Id. Mitchell testified that "I put it in my name, I insured it, that's it." Id. She did so for Henry Lloyd, who "needed a vehicle." Id. at 4. Lloyd came to her workplace, took her driver's license, took it to Defendant's business, and returned to her with the paperwork for the Windstar. Id. at 4-5. She eventually went to Defendant's business to sign the purchase agreement. Id. at 9-10. Mitchell then called an agent to purchase insurance for the vehicle. Id. at 6. Lloyd drove the vehicle, and paid for the insurance, in cash. Id. Id. at 7-8. He would give cash to Mitchell, who then paid for the insurance. Id. at 8. Mitchell's name and purported signature also appeared on the purchase order for the Infiniti, dated June 22, 2007. Id. at 11. Mitchell denied she signed the form. Id. at 12. She also denied purchasing the insurance that covered that vehicle, even though her name appeared on the insurance card. Id. at 13. Though Mitchell denied knowing whether Lloyd was involved in drug dealing, she also testified that she did not provide any funds to purchase the vehicles, and that she lacked the resources to do so. Id. at 13-15.

Henry Lloyd also testified. See dkt. # 159. Lloyd testified that he had pled guilty to money laundering involving "[s]elling drugs and buying vehicles." Id. at 4. Lloyd had previously pled guilty to "possessing or selling crack cocaine" and spent a year in jail. Id. at 5-6. Lloyd testified that he was "dealing drugs" from 2005 to 2008. Id. at 6-7. Moreover, he admitted that he had been selling drugs "[f]or a long time. Since I was like 14, 15-years-old." Id. at 7. He sold crack and cocaine. Id. He made "[a] lot" of money doing so, and worked with others to sell and distribute the drugs. Id. Lloyd imported drugs to Buffalo from Atlanta

and Houston. Id. at 8. He imported large quantities of drugs and generated $100,000s in income from reselling them. Id. at 9-10. After selling the "kilos" of drugs, Lloyd would "[b]uy clothes, jewelry, cars and property." Id. at 11. The funds for these purchases came from "drug money." Id. Buying such goods, however, generated "concerns." Id. Drug dealers like Lloyd could not "put them in our name because we don't have no income to show–legal income to show where it's coming, from where the money is coming from." Id. They could not put the money in the bank, and could not "put nothing over 10,000 with the IRS." Id. Lloyd used a landscaping business "[t]o hide [his] drug money." Id. at 12. Lloyd also hid money in "[s]afety deposit boxes, stash houses." Id. He also used women for "buying vehicles, buying houses and stash the money there, family members." Id. He looked for people with "a steady job" to make these purchases "[t]o show that they can afford whatever stuff I'm trying to purchase, like property or vehicles." Id. at 13. Such purchasers had an intimate relationship with Lloyd, either as a family member or a girlfriend. Id.

Lloyd testified that he had known the Defendant as a car dealer for around ten years. Id. at 13-14. Lloyd purchased a number of cars from Defendant, beginning when he was 17 years old. Id. at 14. He paid for that first vehicle with cash. Id. at 15. Lloyd testified that Defendant had asked him how a young man could have so much cash, and asked him where the money came from. Id. Lloyd "told him I sell drugs." Id. Defendant knew one of Lloyd's friends, who had recently been arrested for "drugs and a gun." Id. Defendant asked how the friend was doing, and then asked Lloyd "you selling crack, you sell butter, you sell–do your shit be good." Id. at 16. Lloyd testified that "butter" referred to crack. Id. Lloyd assured Defendant that it was. Lloyd testified that he showed Defendant crack cocaine. Id. He "pulled out a pocket full of eight balls and quarters and showed it to" Defendant. Id. at

16.  An "eight ball" is 3.5 grams of crack.  Id. at 17.  He showed Defendant sixteen of them.
Id. at 18.

Lloyd further testified that he was a low-level dealer at the time he first purchased a
vehicle from Defendant, but that he eventually became a higher-level operative.  Id. at 18-19.
To become a "bigger" dealer, Lloyd related, he had to find "bigger customers."  Id. at 19.  To
attract such customers, he needed "[f]lashy cars, jewelry."  Id.  Having such goods indicates
that a person is a "drug dealer" in the "drug world."  Id.  "It draws attention and it brings
people to you and they ask, do you have drugs for sale."  Id.  Lloyd testified that a number
of other persons he knew to be drug dealers had purchased vehicles from Defendant.  Id. at
42-45.

Lloyd testified that he bought two other cars from Defendant, an Infiniti Q56 and a
Ford Windstar.  Id. at 21-22.  With the assistance of Mitchell, he and a friend, Tyrone
Pennick, purchased the Ford Windstar for $4,000.  Id. at 22-23.  They drove the vehicle
around Buffalo "and sold drugs out of it."  Id. at 23.  Eventually, Lloyd testified, he traded that
vehicle in on the Infiniti.  Id.  He and Pennick purchased the vehicle from Defendant in May
2007.  Id. at 24-25.  They agreed to pay $35,000 for the vehicle after receiving $3,000 for a
trade-in on the Windstar.  Id. at 25-26.  They had cash sufficient to pay for the vehicle, but
Defendant insisted on receiving cashier's checks and money orders for the vehicle.  Id. at
26.  Lloyd presumed Defendant did not want to take more than $10,000 in cash.  Id. at 27.
Lloyd went to his bank and deposited $9,000 in cash.  Id. at 27.  He testified that he
deposited $9,000 "[b]ecause the bank has to fill out a tax form if you deposition over
$10,000."  Id. at 27.  Lloyd testified that the $9,000 was "drug money."  Id.  Lloyd then wrote
a check for the car from the account of his landscaping business.  Id. at 30.  Pennick and

another woman obtained money orders and cashiers checks for the rest of the purchase price of the vehicle. Id. They used "drug money" to obtain these papers as well. Id. at 31. None of these checks were for more than $10,000, as they wanted to avoid filling out a tax form on the money. Id. They wanted to "conceal where the money came from." Id. at 32.

After obtaining these various checks, they returned to Defendant's business. Id. Lloyd left, and Pennick waited for Defendant to arrive. Id. A few hours later, Pennick picked Lloyd up in the Infiniti Q56. Id. at 32-33. The vehicle was titled in Latese Mitchell's name. Id. at 33. Mitchell was asked to put the Infiniti in her name; they "transferred the plates from the van, because the van was in her name[.]" Id. at 33. Lloyd testified, however, that he had written a check to Defendant's shop for the vehicle, and that he and Pennick were the persons who drove the Infiniti. Id. at 33. They used the car for about eight months, and then Pennick gave the vehicle "back to [Defendant], told him to sell it on his lot." Id. at 34. He did so after Defendant "told him that the IRS raided the shop and was asking questions about the drug dealers that brought the car[.] . . . Tyrone thought the main reason why they raided the shop is because of the cars that he bought from" Defendant. Id. at 35. Lloyd testified that after Defendant sold the vehicle he gave Pennick around $6,000. Id. at 40.

The Court finds the evidence related above sufficient to sustain Defendant's conviction on Count 8. A rational juror could find the evidence sufficient to prove beyond a reasonable doubt that the vehicles were purchased with money from drug transactions–Lloyd testified as much, and the jury would only have to credit his testimony to find this element proved. Likewise, the jury would need only to find Lloyd credible to conclude that Defendant knew that Lloyd sold drugs and sought to purchase vehicles with the funds from that operation. The circumstantial evidence available to come to that

conclusion was plentiful; Lloyd testified that he had shown Defendant the drugs he was

selling when he was seventeen.  He also testified about Defendant's response to that

information, which could lead a jury to conclude that Defendant was a willing participant in

Lloyd's efforts to dispose of the cash he obtained from these sales.  The testimony of Lloyd

and Mitchell also provided the jury with sufficient circumstantial evidence to conclude that the

auto sales–titled to Mitchell but for vehicles to be used by Lloyd and Pennick–were for the

purpose of concealing the source of the funds, and to avoid a reporting requirement.

Indeed, the testimony that Lloyd provided could be used as circumstantial evidence to prove

Counts 3 and 7 under the totality of the circumstances.  The Court will therefore deny the

motion as to Count 8 as well.

### B.  Amendment of the Indictment

Defendant next argues that the jury verdict form improperly amended the

indictment on Counts 17, 19, 24 and 25 and his convictions on those counts should be

dismissed as well.  As to those counts, the indictment alleges that Defendant:

> was engaged in a trade or business, namely, the sale of automobiles, and did
> receive in the course of such trade and business United States currency in excess
> of $10,000, as described further below, without filing a 'Report of Cash Payments
> Over $10,000 Received in a Trade or Business (FINCEN Form 8300) at such time
> and in such manner as the Secretary of the Department of the Treasury has, by
> regulation, prescribed, namely, Title 31, Code of Federal Regulations, Section
> 103.30, and did so while violating another law of the United States, namely, Title
> 18, United States Code, Section 1956(h), 1956(a)(1)(B)(i), 1956(a)(1)(B)(ii),  and
> 1957(a), and as part of a pattern of illegal activity involving more than $100,000 in
> a 12-month period . . . All in violation of Title 31 United States Code, Section 5331
> and 5322(b).

Indictment, dkt. # 1.  Count 17 references a transaction involving a 2001 GMC Yukon, sold

for $25,000 on February 27, 2006.  Count 19 references a transaction involving a 2002

Mercedes, sold for $23,000 on June 8, 2006.  Count 24 references a transaction involving a

2004 Infiniti QX56, sold for $34,455 on June 9, 2007.  Count 25 references a transaction involving a 2006 Landrover, sold for $45,000 on July 12, 2007.

"The Grand Jury Clause of the Fifth Amendment provides that 'no person shall be held to answer for a capital, or otherwise infamous crime, unless upon a presentment or indictment of a Grand Jury.'" United States v. Mucciante, 21 F.3d 1228, 1233 (2d Cir. 1994) (quoting U.S. CONST. Amend. V).  "[A] defendant may be tried and convicted only on those charges contained in the indictment returned by a grand jury." Id.  "Once the grand jury returns an indictment, only the grand jury may lawfully amend that indictment." Id.  "It is well settled that the constructive amendment of an indictment is *per se* violative of the Grand Jury Clause of the Fifth Amendment[.]" United States v. Zingaro, 858 F.2d 94, 98 (2d Cir. 1988). The purpose of the grand jury requirement "'is to limit [a defendant's] jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge.'" Id. (quoting Stirone v. United States, 361 U.S. 212, 218 (1960)).  "Where an essential element of the charges has been altered without resubmission to the grand jury, 'deprivation of such a basic right is far too serious to be treated as nothing more than a variance and then dismissed as harmless error.'" Id. (quoting Stirone, 361 U.S. at 217). Constructive amendment of an indictment occurs "when its terms 'are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment.'" Mucciante, 21 F.3d at 1233 (quoting United States v. Mollica, 849 F.2d 723, 729 (2d Cir. 1988)).

Defendant contends that the jury's verdict form improperly broadened the scope of the indictment on these Counts by permitting the jury to convict Defendant of a Count if he

- 16 -

failed to file the currency report form, even if the jury found that his failing was not part of

other illegal conduct or part of a pattern of illegal activity that involved more than $100,000 in

a twelve-month period.  In other words, the Defendant claims that the Court's verdict form

amended the indictment by replacing conjunctive language with disjunctive.  According to the

Defendant, the indictment charged him with one crime that had three elements on each of

the Counts in question.  The verdict form, however, allowed the jury to find the Defendant

guilty of two separate crimes.  This "change," he contends, constructively amended the

indictment and violated his due process rights.

Here the indictment accused Defendant of violating two federal statutes, 31 U.S.C.

§§ 5331 and 5322(b).  Section 5331 describes the conduct which constituted a violation of

federal law, mandating that "[a]ny person–(1)(A) who is engaged in a trade or business, and

(B) who, in the course of such trade or business, receives more that $10,000 in coins or

currency in 1 transaction (or 2 or more related transactions) . . . shall file a report [as

required by regulations] with the Financial Crimes Enforcement Network[.]" 31 U.S.C. §

5331(a).  Section 5322 describes the penalties for violating these filing requirements. See

31 U.S.C. § 5322.  Section 5322(a) mandates a fine of "not more than $250,000, or

imprison[ment] for not more than five years, or both" for "[a] person willfully violating" those

requirements.  31 U.S.C. § 5322(a).  Section 5322(b) mandates a fine of "not more than

$500,000" and imprisonment "for not more than 10 years, or both," when a defendant

"willfully" violates the reporting requirements "while violating another law of the United States

or as part of a pattern of any illegal activity involving more than $100,000 in a 12-month

period[.]" 31 U.S.C. § 5322(b).  The Court instructed the jury on the reporting requirement in

Section 5331 and on the elements of the penalties available for violating that reporting

requirement as stated in Section 5322(a) and (b).

Defendant does not object to the Court's instructions concerning these reporting

requirements, or the elements of proving the criminal penalties contained in Chapter 5322.

Defendant does not contend that the proof at trial amended the allegations in the indictment

and sought conviction based on facts not in that document.  Instead, Defendant points to the

jury verdict form, which permitted the jury to find that Defendant was guilty of willfully

violating the reporting requirement yet not guilty of doing so while engaging in other specified

criminal activity or as part of a pattern of illegal activity involving more than $100,000 in a 12-

month period.  The Court reads this argument as a claim that the Court's instructions to the

jury constructively amended the indictment and added charges not stated in that document.

The Court will reject this argument, as the Court earlier rejected Defendant's

argument regarding the elements of the crime raised in the context of the parties' proposed

jury charges.  "[C]onstructive amendment occurs only when the proof or the jury charge

modifies 'an *essential element* of the offense charged.'" Mucciante, 21 F.3d at 1234 (quoting

United States v. Weiss, 752 F.2d 777, 787 (2d Cir. 1985) (emphasis in original).  Here, the

charge did not alter any of the essential elements of the crime charged.  The Supreme Court

is clear that "an indictment may charge numerous offenses or the commission of any one

offense in several ways.  As long as the crime and the elements of the offense that sustain

the conviction are fully and clearly set out in the indictment, the right to a grand jury is not

normally violated by the fact that the indictment alleges more crimes or other means of

committing the same crime."  United States v. Miller, 471 U.S. 130, 136 (1985).  "Modern

criminal law has generally accepted that an indictment will support each offense contained

within it." Id. at 144. "[E]ach offense whose elements are fully set out in an indictment can independently sustain a conviction." Id. at 136. Thus, "[w]here there are several ways to violate a criminal statute . . . 'federal pleading requires . . . that an indictment charge in the conjunctive to inform the accused fully of the charges.'" United States v. McDonough, 56 F.3d 381, 390 (2d Cir. ) (quoting United States v. McGinnis, 783 F.2d 755, 757 (2d Cir. 1986)). "A conviction under such an indictment will be sustained if the evidence indicates that the statute was violated in any of the ways charged." Id.; see also, United States v. Mejia, 545 F.3d 179, (2d Cir. 2008) (defendant not subject to constructive amendment when convicted under indictment that charged him with "engag[ing] in both acts and threats of murder *and* narcotics trafficking" as part of a RICO conspiracy because jury found he had engaged in one of those acts).

Here, the indictment alleges that Defendant willfully failed to report cash transactions of more than $10,000 in violating of the regulations governing such transactions, and did so while violating another law of the United States and as part of a pattern of illegal activity constituting more than $100,000 in a 12-month period. Defendant's complaint that the Court's jury instructions altered this indictment and added counts under 31 U.S.C. 5233(a) are misplaced, since all of the elements of the penalties portion of the statue are satisfied by the elements alleged in the Indictment. Defendant was surely put on notice that he was accused of a willful failure to report cash transactions greater than $10,000. There was no constructive amendment of the statute. The motion is therefore denied in this respect as well.

### C.  Verdict Slip

Finally, the Defendant argues that verdict slip was confusing to the jury.  Defendant first argues that a jury question to the Court, which inquired whether Defendant could be found guilty of one charge without being found guilty of all of them, demonstrates that the jury was clearly confused by the wording of the verdict slip.  Defendant contends that this "impacted" deliberations.   Defendant also argues that the verdict slip's instructions on Counts 17-25 were confusing to the jury, "because it is impossible to tell, and not clarified on the Verdict form, if both 'parts' of the Count are required for the Defendant to be found guilty of that Count."

These counts cover the failure-to-report charges that are the subject of section IIIB above.  For these counts, the slip inquired (as an example):

### Count 17

Whether Defendant JERRY ROBBINS committed this count in the transaction that alleged occurred on 2/27/06 involving a 2001 GMC Yukon allegedly purchased for $25,000:

_____        _____
Not Guilty        Guilty

**If you found the defendant guilty, proceed to the next question.  If you found the defendant not guilty, skip to Count 18**

Whether the Defendant JERRY ROBBINS committed this count while either (1) violating another law of the United States, namely the money laundering statutes in either Title 18, United States Code, Section 1956(h), 1956(a)(1)(B)(i), 1956(a)(1)(B)(ii); or (2) as part of a pattern of illegal activity involving more than $100,000 in a 12-month period?

_____        _____
Not Guilty        Guilty

See dkt. # 154.  Each count referenced the corresponding transaction in the indictment and asked the jury to make the same findings for each transaction.

Courts are clear that "[b]arring contrary evidence, we must presume that juries follow the instructions given them by the trial judge." United States v. Casamento, 887 F.2d 1141, 1151 (2d Cir. 1989). Such "instructions will be deemed adequate, so long as the charge, taken as a whole, is correct and sufficiently covers the case so that a jury can intelligently determine the questions presented to it." Care Travel Co. v. Pan Am. World Airways, Inc., 944 F.2d 983, 996 (2d Cir. 1991). Moreover, "'[w]here different offenses are charged in separate counts of a single indictment, an acquittal on one or more of the counts does not invalidate a verdict of guilty even where the same evidence is offered in support of each count.'" United States v. Hannah, 584 F.2d 27, 30 (2d Cir. 1978) (quoting United States v. Vastine, 363 F.2d 853, 854 (3d Cir. 1966)). Courts reject claims that the instructions or the verdict form were confusing when "the jury's differing decisions on the various counts indicates that they were able to follow the court's instructions and were not confused." United States v. Dennis, 217 F.3d 71, 73 (2d Cir. 2001).

Defendant's claim that the jurors' question of whether the Defendant could be found guilty of one charge without being found guilty of all of them reflects confusion about the jury form is not supported by the jurors' actions. First, the question did not reference any specific counts, and neither the Defendant nor the Court have any way of determining whether the juror's question addressed the entire verdict form, the Court's instructions, or the particular portion of the verdict form about which Defendant complains. The jurors' question may have indeed asked about Counts 17-25, but it might have easily have asked whether circumstantial evidence that pointed to car sales with one particular drug dealer was sufficient to provide circumstantial evidence for all of the other counts. The jury's mixed verdict clearly demonstrates that they were not confused about the proof necessary to

convict on each Count, and that they considered the evidence supporting each of those

Counts.  Second, even if the question were about Counts 17-25, the jurors' determinations

on those Counts demonstrates that they understood the verdict slip to require an initial

finding and then a supplemental one.   The jurors demonstrated this understanding.  On

Counts 18, 20, 21, 22 and 23, they found Robbins "not guilty" on the initial question, and

then properly followed the instructions to skip to the next count.  Jurors clearly understood

when they were to consider the proof for two separate parts of the Count.  On Counts 17, 19,

and 24 and 25 jurors found Defendant guilty of the first part of the question–whether Robbins

failed to file a transaction report for the cash sale in question–and not guilty on the second

part of the question–whether Robbins failed to file the transaction report while violating

another United States law or as part of a larger pattern of illegal activity.  The jurors clearly

understood that, if they found Defendant guilty on the first part of the Count, they were to

consider the evidence supporting the second part of the Count separately.  They found

Defendant not guilty on that second part of the Count in Counts 17, 19 and 25, and guilty on

Count 24.  The verdict therefore demonstrates that the jurors understood the Courts' charge.

　　　　Defendant's claim that the jurors' verdict was inconsistent because the questions

on the verdict slip were inconsistent is no more tenable.   Defendant's position is that the two

parts of each Count essentially ask the jurors the same question.[1]  Defendant does not make

--------------------------------

[1]Defendant claims that "The jury essentially found two logically inconsistent and incompatible findings in split verdicts, in that:

(i)      the jury found Defendant was engaged in a trade or business receiving more than $10,000 in transaction(s) and willfully did not file the requisite report(s) while violating another law of the United States or as part of a pattern of illegal activity in a 12-month period involving more than $100,000; and

(ii)     that the Defendant had no knowledge that the property in question was obtained from unlawful activity or that the transaction(s) were designed to conceal or avoid any reporting requirement under State or Federal Law or that those transaction(s)

(continued...)

any reference to the Court's instructions to the jury regarding these Counts.  Had the

Defendant done so, the Defendant would be forced to concede that the Court instructed the

jury to determine first whether Defendant willfully violated a cash-transaction reporting

requirement.  If the jury found that the Defendant had done so, the jury was then to consider

whether the Defendant did so while committing another crime or as part of a pattern of illegal

activity.  The jurors' verdict indicates that they understood the Court's instructions in their

totality, and were not in any way confused by the verdict form.  The motion for acquittal will

be denied in this respect as well.

## IV.      CONCLUSION

For the reasons stated above, Defendant's motion for acquittal, dkt. # 157, will be

DENIED.


IT IS SO ORDERED.

DATED:  February 5, 2015.

Thomas J. McAvoy
Senior, U.S. District Judge

_____

[1](...continued)

   were part of a pattern of illegal activity involving more than $100,000 in a 12-month
   period.
Defendant's position here misstates the verdict slip and the jury's findings on these counts, which clearly
indicates that the jury believed that Defendant willfully evaded a reporting requirement, but did not do so as a
part of commission of another crime or as part of a larger pattern of illegal activity.  The jury made separate
findings on the Counts.  As explained above, the Counts permitted such findings.  Indeed, read literally, the
Defendant's argument should be that the jury's findings are inconsistent because the initial finding should
have led the jury to find Defendant guilty on the second question as well.  Defendant surely does not seek to
convince the Court that the jury's should have found him guilty of both parts of the offense.

- 23 -