**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

**UNITED STATES OF AMERICA**

        V.                                                1:10-CR-268
                                                               1:17-CV-399

**JERRY ROBBINS a/k/a JERRY ROBINS,**

        **Defendant.**

_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**

## DECISION & ORDER

      Before the Court is Petitioner Jerry Robins' motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. The parties have briefed the issue and the Court has determined to decide the motion without oral argument.

**I.     BACKGROUND**

      The government charged Petitioner Jerry Robbins in a twenty-six count Indictment on September 15, 2010. See dkt. # 1. Generally, the government alleged that Petitioner laundered money for drug dealers through his business, Finish Line Auto Sales. According to the government, Petitioner sold automobiles to persons he knew to be drug dealers for cash, titled those vehicles in the names of third parties, and then failed to file currency reports mandated by federal law for cash transactions of more than $10,000. Such practices, the government alleged, were a means by which persons engaged in illegal drug sales could dispose of the cash from those sales and make the money appear to come from a legitimate source.

1

Count 1 of the Indictment charged Petitioner with conspiracy to engage in money laundering. Count 2 alleged money laundering in a sale to an undercover officer. Counts 3 through 9 charged money laundering with respect to specific transactions. The Indictment listed a particular vehicle, purchase price, and date of transaction, but alleged that the criminal conduct was of the same type for each transaction. Counts 10 through 16 charged defendant with engaging in monetary transactions within the United States involving property valued greater than $10,000 which was derived from a specified unlawful activity. The government also charged Petitioner with aiding and abetting on Counts 3 through 16. Counts 17 through 25 charged Petitioner with violating certain laws related to reporting cash transactions over $10,000. Each of those counts referenced specific transactions. Count 26 charged Petitioner with violating laws prohibiting the destruction of property subject to seizure.

After a trial, the jury returned a verdict of guilty against Petitioner on Counts 3, 7, 8, 17, 19, 24 and 25. The jury acquitted the Petitioner on all other Counts. After an appeal, the United States Court of Appeals for the Second Circuit on January 9, 2017 determined that the facts were insufficient to convict Petitioner on Count 7, vacated his conviction on that Count, and remanded for resentencing. See dkt. # 238. The Court then resentenced Petitioner. See dkt. # 255. Petitioner immediately filed a motion to vacate pursuant to 28 U.S.C. § 2255. See dkt. # 256. He later filed a motion for bail pending the outcome of his petition. See dkt. #265. The government has responded to the motion to vacate, and Petitioner filed a reply brief. See dkt. #s 259, 264.

## II. LEGAL STANDARD

Petitioner seeks to set aside his sentence pursuant to 28 U.S.C. § 2255. A § 2255

challenge is limited to claims that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255. Thus, relief pursuant to section 2255 is available only "for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in [a] complete miscarriage of justice.'" Graziano v. United States, 83 F.3d 587, 590 (2d Cir. 1996)(quoting United States v. Bokun, 73 F.3d 8, 12 (2d Cir. 1995)) (internal quotation marks and citations omitted). In a Section 2255 proceeding, a petitioner bears the burden of proof by a preponderance of the evidence. See Triana v. United States, 205 F.3d 36, 40 (2d Cir. 2000). "Airy generalities, conclusory assertions and hearsay statements will not suffice because none of these would be admissible evidence at a hearing." United States v. Aiello, 814 F.2d 109, 113 (2d Cir. 1987).

## III. ANALYSIS

Petitioner raises several grounds for why his motion should be granted.[1] Petitioner grounds each of these arguments as violations of his right to effective assistance of counsel. "The right to counsel is a fundamental right of criminal defendants; it assures the fairness, and thus the legitimacy, of our adversary process." Kimmelman v. Morrison, 477 U.S. 365, 374 (1986). The right to counsel is not satisfied simply because counsel is present: "the right to counsel is the right to effective assistance of counsel." Id. at 377. An

---

[1] Petitioner moves for leave to file a brief in excess of the length permitted by the Court's rules. See dkt. # 257. That motion will be granted and the Petitioner's brief considered.

3

ineffectiveness claim asserts "that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." Id. at 374. "To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." United States v. Pitcher, 559 F.3d 120, 123 (2d Cir. 2009). In evaluating counsel's performance, the Court "must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance'" and "'[t]he reasonableness of counsel's performance is to be evaluated from the counsel's perspective at the time of the alleged error and in light of all the circumstances.'" Raysor v. United States, 647 F.3d 491, 495 (2d Cir. 2011) (quoting Kimmelman, 477 U.S. at 365).

### A. Testimony of Henry Lloyd

Petitioner argues that his counsel denied him effective assistance of counsel by failing properly to impeach the testimony of Henry Lloyd. The Court summarized Lloyd's testimony in addressing Petitioner's post-trial motion:

> Henry Lloyd also testified. See dkt. # 160. Lloyd testified that he had pled guilty to money laundering involving "[s]elling drugs and buying vehicles." Id. at 4. Lloyd had previously pled guilty to "possessing or selling crack cocaine" and spent a year in jail. Id. at 5-6. Lloyd testified that he was "dealing drugs" from 2005 to 2008. Id. at 6-7. Moreover, he admitted that he had been selling drugs "[f]or a long time. Since I was like 14, 15-years-old." Id. at 7. He sold crack and cocaine. Id. He made "[a] lot" of money doing so, and worked with others to sell and distribute the drugs. Id. Lloyd imported drugs to Buffalo from Atlanta and Houston. Id. at 8. He imported large quantities of drugs and generated $100,000s in income from reselling them. Id. at 9-10. After selling the "kilos" of drugs, Lloyd would "[b]uy clothes, jewelry, cars and property." Id. at 11. The funds for these purchases came from "drug money." Id. Buying such goods, however, generated "concerns." Id. Drug dealers like Lloyd could not "put them in our name because we don't have no

4

income to show–legal income to show where it's coming, from where the money is coming from." Id. They could not put the money in the bank, and could not "put nothing over 10,000 with the IRS." Id. Lloyd used a landscaping business "[t]o hide [his] drug money." Id. at 12. Lloyd also hid money in "[s]afety deposit boxes, stash houses." Id. He also used women for "buying vehicles, buying houses and stash the money there, family members." Id. He looked for people with "a steady job" to make these purchases "[t]o show that they can afford whatever stuff I'm trying to purchase, like property or vehicles." Id. at 13. Such purchasers had an intimate relationship with Lloyd, either as a family member or a girlfriend. Id.

Lloyd testified that he had known the Defendant as a car dealer for around ten years. Id. at 13-14. Lloyd purchased a number of cars from Defendant, beginning when he was 17 years old. Id. at 14. He paid for that first vehicle with cash. Id. at 15. Lloyd testified that Defendant had asked him how a young man could have so much cash, and asked him where the money came from. Id. Lloyd "told him I sell drugs." Id. Defendant knew one of Lloyd's friends, who had recently been arrested for "drugs and a gun." Id. Defendant asked how the friend was doing, and then asked Lloyd "you selling crack, you sell butter, you sell–do your shit be good." Id. at 16. Lloyd testified that "butter" referred to crack. Id. Lloyd assured Defendant that it was. Lloyd testified that he showed Defendant crack cocaine. Id. He "pulled out a pocket full of eight balls and quarters and showed it to" Defendant. Id. at 16. An "eight ball" is 3.5 grams of crack. Id. at 17. He showed Defendant sixteen of them. Id. at 18.

Lloyd further testified that he was a low-level dealer at the time he first purchased a vehicle from Defendant, but that he eventually became a higher-level operative. Id. at 18-19. To become a "bigger" dealer, Lloyd related, he had to find "bigger customers." Id. at 19. To attract such customers, he needed "[f]lashy cars, jewelry." Id. Having such goods indicates that a person is a "drug dealer" in the "drug world." Id. "It draws attention and it brings people to you and they ask, do you have drugs for sale." Id. Lloyd testified that a number of other persons he knew to be drug dealers had purchased vehicles from Defendant. Id. at 42-45. Lloyd testified that he bought two other cars from Defendant, an Infiniti Q56 and a Ford Windstar. Id. at 21-22. With the assistance of Mitchell, he and a friend, Tyrone Pennick, purchased the Ford Windstar for $4,000. Id. at 22-23. They drove the vehicle around Buffalo "and sold drugs out of it." Id. at 23. Eventually, Lloyd testified, he traded that vehicle in on the Infiniti. Id. He and Pennick purchased the vehicle from Defendant in May 2007. Id. at 24-25. They agreed to pay $35,000 for the vehicle after receiving $3,000 for a trade-in on the Windstar. Id. at 25-26. They had cash sufficient to pay for the vehicle, but Defendant insisted on receiving cashier's checks and money orders for the vehicle. Id. at 26. Lloyd presumed Defendant did not want to take more than $10,000 in cash. Id. at 27. Lloyd went to his bank and deposited $9,000 in cash. Id. at 27. He testified that he deposited $9,000 "[b]ecause the bank has to fill out a tax form if you deposit over $10,000." Id. at 27. Lloyd testified that the $9,000 was "drug money." Id. Lloyd then wrote a

5

check for the car from the account of his landscaping business. Id. at 30. Pennick and another woman obtained money orders and cashiers checks for the rest of the purchase price of the vehicle. Id. They used "drug money" to obtain these papers as well. Id. at 31. None of these checks were for more than $10,000, as they wanted to avoid filling out a tax form on the money. Id. They wanted to "conceal where the money came from." Id. at 32.

After obtaining these various checks, they returned to Defendant's business. Id. Lloyd left, and Pennick waited for Defendant to arrive. Id. A few hours later, Pennick picked Lloyd up in the Infiniti Q56. Id. at 32-33. The vehicle was titled in Latese Mitchell's name. Id. at 33. Mitchell was asked to put the Infiniti in her name; they "transferred the plates from the van, because the van was in her name[.]" Id. at 33. Lloyd testified, however, that he had written a check to Defendant's shop for the vehicle, and that he and Pennick were the persons who drove the Infiniti. Id. at 33. They used the car for about eight months, and then Pennick gave the vehicle "back to [Defendant], told him to sell it on his lot." Id. at 34. He did so after Defendant "told him that the IRS raided the shop and was asking questions about the drug dealers that brought the car[.] . . . Tyrone thought the main reason why they raided the shop is because of the cars that he bought from" Defendant. Id. at 35. Lloyd testified that after Defendant sold the vehicle he gave Pennick around $6,000. Id. at 40.

See dkt. # at 11-14. The Court found this testimony sufficient to convict Petitioner on

Count 8. Id. at 14-15.

The Court concluded, in relevant part, that:

A rational juror could find the evidence sufficient to prove beyond a reasonable doubt that the vehicles were purchased with money from drug transactions–Lloyd testified as much, and the jury would only have to credit his testimony to find this element proved. Likewise, the jury would need only to find Lloyd credible to conclude that Defendant knew that Lloyd sold drugs and sought to purchase vehicles with the funds from that operation. The circumstantial evidence available to come to that conclusion was plentiful; Lloyd testified that he had shown Defendant the drugs he was selling when he was seventeen. He also testified about Defendant's response to that information, which could lead a jury to conclude that Defendant was a willing participant in Lloyd's efforts to dispose of the cash he obtained from these sales. The testimony of Lloyd and Mitchell also provided the jury with sufficient circumstantial evidence to conclude that the auto sales–titled to Mitchell but for vehicles to be used by Lloyd and Pennick–were for the purpose of concealing the source of the funds, and to avoid a reporting requirement.

Id.

6

Petitioner's motion is focused largely on the false testimony he contends Lloyd provided at trial. Petitioner points to information he acquired "[p]ost conviction, and by happenstance" about Lloyd as a basis for his attorney's failings. This information consists of an affidavit in support of a motion that Tyrone Pennick filed after his indictment. Plaintiff contends that the motion sought dismissal of the indictment due to outrageous government conduct. See "Attachment" to Plaintiff's Brief, dkt. # 257-1.

The evidence in question relates to statements and testimony that Lloyd made in connection with another case involving Lloyd's drug-dealing partner, Tyrone Pennick. See United States v. Hill, No. 10cr191 (W.D.N.Y.). Petitioner points to a motion to dismiss the indictment in that case filed by Pennick. See Supplemental Affirmation, attached as an exhibit to Plaintiff's Brief, dkt. # 257-1. The affirmation Petitioner uses was submitted in support of a motion to dismiss the indictment against Tyrone Pennick in the Hill case. Pennick's motion addresses the conduct of two confidential sources not named in the actual motion. Id. at ¶ 3. Someone has identified one of those sources as Henry Lloyd by handwriting his name next to "CHS-2." Id.

The affirmation alleges that "[p]rior to being charged in the criminal complaint, it is respectfully submitted that [redacted] was cooperating with the government after having been arrested and charged in an indictment filed August 21, 2007." Id. at ¶ 5 [citing to United States v. Henry Lloyd, 07cr200 (W.D.N.Y)]. The affirmation further contends that Lloyd "was sentenced in federal court on March 2, 2009. The defendant was to have received a reduced sentence pursuant to U.S.S.G. Section 5K1.1 but the government declined to file the motion." Id. at ¶ 7. According to the affirmantion, Lloyd, during the time he cooperated with the government "allegedly sold 4½ ounces of crack cocaine to an

7

individual" and later purchased additional cocaine for $5,000.  Id. at ¶¶ 9-10.  Further, the document alleges, "[i]t is presumed that [redacted] provided agents with information regarding his alleged purchase of ten kilograms of cocaine in New Jersey" that supposedly occurred in 2008.  Id. at ¶ 13.  Those allegations of the cocaine purchase were used in affidavits to obtain a search warrant and in filing the criminal complaint in the Hill case.  Id. at ¶ 14.  The affirmation continues, stating that "[redacted] was sentenced on March 2, 2012 to twelve months and one day."  Id. at ¶ 15.  "According to the defense investigation, after [redacted's] release from prison, he again was debriefed by the government."  Id. at ¶ 16.  At that time, [redacted] emphatically advised agents that the previous information regarding the September 2008 purchase of ten kilograms of cocaine in New Jersey was not true."  Id.  The affirmation contends that agents, despite their knowledge from Lloyd that the information about the cocaine sale was false, used that alleged sale to obtain an indictment against Pennick.  Id. at ¶ 17.

Petitioner contends that Lloyd was denied credit for cooperating at his sentencing because he allegedly testified falsely in the proceedings against his partner, Pennick. When defense counsel asked Lloyd at trial whether he had forfeited a sentence reduction due to false testimony, Petitioner claims, Lloyd denied that claim.  The government did not correct the false impression left by this testimony that Lloyd had not testified falsely. Defense counsel did not object to the falsehood and did not seek a sidebar to explain to the Court the basis for his questions.

At trial, Petitioner's counsel questioned Lloyd about his cooperation and about several plea deals into which Lloyd had entered.  Counsel brought out that one of the plea deals may have fallen through because of untruthful testimony from Lloyd.  See Trial

8

Transcript ("R."), at 58-68. Counsel also asked about events that appear to be the subject of the affidavit in question. Trial counsel's questioning eventually appeared to approach the question of whether Lloyd had testified falsely to the grand jury. Id., at 68. Defense counsel asked Lloyd whether he had been denied sentencing credit because he "gave false testimony in a Grand Jury." Id. Lloyd denied that accusation, and Counsel asked whether Lloyd "testif[ied] in Grand Jury proceedings concerning Tryone Pennick[.]" Id. Lloyd refused to answer the question, stating that "Tyrone Pennick is not on trial." Id. This testimony caused an objection from the prosecutor as "beyond the scope." Id. When the Court stated that it could not rule "because I–I don't know," defense counsel withdrew the question. Id. Defense counsel then questioned Lloyd about a number of other individuals involved in drug cases in the Western District of New York, including Tyrone Pennick. Id. at 69. Counsel asked about a case involving "Rodney Hill, Tyrone Pennick, and a number of other people . . . prosecuted here in the Western District of New York . . . for a conspiracy of their own[.]" Id. When asked whether he provided information in that case, Lloyd responded that "I'm not obligated to answer that." Id. at 70. The government interjected at that point:

> [The Prosecutor]: I'll object, Judge. I'll object to the relevancy. It's understood he cooperated. I don't think the specifics of any cooperation are relevant to the occasion.
> A. I think you're getting into something that you got misleaded [sic] on information. The plea agreement from 2008, my plea - - my case didn't start until after I got released from prison with the conspiracy to commit money laundering.
> So I didn't false – give any information or anything. I was corroborating [sic] with the government when I took that plea in 2008. I didn't give no false information at all. I didn't start corroborating [sic] with the government until after January – February 2010.
> [defense counsel]: I'm going to agree with [the prosecutor] that this is a little too collateral for this issue. I have no further questions.

9

Id. at 70.

Petitioner argues that he was the victim of ineffective assistance of counsel in connection with his counsel's cross-examination of Lloyd. See Petitioner's Brief, dkt. # 257-1, at 14-15. Trial counsel, Petitioner insists, had to have been aware that Lloyd perjured himself at trial when he claimed that he had not testified falsely or misled investigators in connection with Pennick's case. Lloyd changed his story, Petitioner claims, and argues that prosecutors "suborned perjury" by not correcting such testimony and objecting to a question about grand jury testimony. Petitioner's counsel's failure to explain to the Court Lloyd's alleged false statements in this respect permitted the alleged perjury to remain in the record and amounted to ineffective assistance and allowed the prosecutor to avoid his constitutional obligation to disclose potentially exculpatory evidence. Instead, trial counsel abandoned any efforts to impeach Lloyd at trial and agreed that the testimony was irrelevant. No strategic calculation, Petitioner contends, can justify Counsel's abandonment of his efforts to impeach Lloyd with his previous statements to investigators. Since the case turned largely on Lloyd's testimony, Petitioner argues he suffered prejudice sufficient to vacate his conviction.

The Court will deny the motion to vacate in this respect. The Court finds that defense counsel's performance did not fall below an objective standard of reasonableness when he cross-examined Lloyd. "[D]ecisions that 'fall squarely within the ambit of trial strategy . . . if reasonably made,' cannot support an ineffective assistance claim." United States v. Eisen, 974 F.2d 246, 265 (2d Cir. 1992) (quoting United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987)). Included in that category of "strategic decision" are counsel's "'decisions whether to engage in cross-examination, and if so to what extent and

10

in what manner[.]'" Id. (quoting Nesesian, 824 F.2d at 1294). Courts generally accord "significant deference" to "a trial counsel's decision how to conduct cross examination" and "[refuse] to use perfect hindsight to criticize unsuccessful trial strategies." Eze v. Senkowski, 321 F.3d 110, 132 (2d Cir. 2003). Courts do not "second-guess" the conduct of cross examination "unless there is no strategic or tactical justification for the course taken." United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998).

Petitioner's complaint is that his counsel failed to put forth evidence about Lloyd's alleged false statements to investigators and before a grand jury. As noted above, defense counsel asked Lloyd specific questions about his motives for testifying, which included significant reductions in sentences he potentially faced, and brought out that Lloyd's conduct had in some way limited the benefits he might have received from testifying. Counsel attempted to elicit evidence about the statements Petitioner claims were falsely made, but an objection from the prosecutor and a ruling from the bench caused counsel to abandon efforts to introduce additional information, which he acknowledged was collateral to the matter at hand. Under those circumstances, the Court finds counsel's decision to rely on testimony that showed Lloyd's motives for testifying as sufficient to attack his credibility. "There is no reason to believe that further cross examination would have had any more than a negligible effect on the jury's verdict." United States v. O'Neil, 118 F.3d 65, 73 (2d Cir. 1997). Counsel expressed fear that discussions about testimony in other cases would only distract and confuse the jury; the Court finds that such fears were not unreasonable.

Petitioner contends his counsel should have used the information contained in the affidavit cited above to impeach Lloyd. His motion fails to note that the motion in question

11

remains sealed on the docket in the Hill case. See WDNY Case No. 10cr191, dkt. # 477. How his attorney would have had access to that docket or the information contained in the docket at the time of his trial is unclear. Failing to introduce evidence unavailable to the attorney can hardly be ineffective assistance.[2] Petitioner has not established that his counsel was aware of this filing at the time of his trial or aware of the underlying accusations. Even assuming that counsel was aware of the document, Petitioner's trial counsel could quite reasonably have concluded that an affidavit supporting a motion in another criminal case was an insufficient basis on which to cross-examine Lloyd, that the Court would likely find the evidence inadmissible because it simply amounted to an allegation in a collateral matter, and that spending a great deal of time on that issue would distract a jury that had already been shown that Lloyd was untrustworthy and had a motive to lie. The Court cannot find "there is no strategic or tactical justification for the course taken," and thus must find that counsel's conduct did not fall below an objective standard of reasonableness in this respect. Luciano, 158 F.3d at 660.

Moreover, even if counsel could be seen as falling below an objective standard of reasonableness, the Court is not persuaded that Petitioner suffered sufficient prejudice from counsel's failure to continue attempting to impeach Lloyd about his testimony in other cases. The Court is unpersuaded that Petitioner has demonstrated a "reasonable

---

[2]The Court notes that the government admitted in responding to Pennick's motion that Lloyd "did provide false information to the Government. However, upon discovery of the false nature of the witness's information by the Government, this fact was fully presented to the Grand Jury by the prosecutor prior to the return of the indictment and thus any alleged 'taint' of the proceedings or outrageous government conduct on the part of the Government in knowingly presenting false information to the Grand Jury is unfounded." See Case No. 10cr191, dkt. # 482, at 6-7.

12

probability that, but for counsel's errors, the result of the proceeding would have been different." Pitcher, 559 F.3d at 123. Counsel did impeach Lloyd about alleged false statements, and questioned him about contradictory testimony in this case. Additional efforts at impeachment as proposed here would not have contradicted testimony that Lloyd had known Petitioner for years, was known by Petitioner to be a drug dealer, and purchased cars from Petitioner. The motion to vacate will be denied on these grounds.

### B.     Failure to Pursue Brady Violation

Petitioner next argues that his counsel was ineffective for failing to pursue what Petitioner contends was the government's obvious violation of his right to potentially exculpatory evidence under the doctrine first articulated in Brady v. Maryland, 373 U.S. 83 (1963), thus permitting Lloyd to give false testimony.[3] Under the standard articulated in that case, "[t]o the extent that the prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation to disclose that evidence to the defendant." United States v. Avellino, 136 F.3d 249, 255 (2d

---

[3]Petitioner does not argue that the government violated his constitutional rights by failing to disclose information. He did not argue a Brady violation on appeal. "[C]ourts apply a 'general rule that claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice.'" Locurto v. United States, No. 10cv4589, 2018 U.S. Dist. LEXIS 34553, at *5 (E.D.N.Y. Feb. 28, 2018) (quoting Massaro v. United States, 538 U.S. 500, 504 (2003)). That "bar does not apply to claims of ineffective assistance of counsel." Id. Petitioner offers no argument as to whether cause and prejudice exists for failing to raise the Brady claim on appeal. The motion to dismiss filed by Pennick in the Hill case was filed well before Petitioner's trial, and his counsel knew enough about the matter to raise questions at trial. Petitioner thus cannot claim that he was unaware of the alleged failure to turn over exculpatory evidence at the time of his appeal. Cause therefore does not exist. As such, the Court must consider the alleged Giglio violation in the context of Petitioner's Sixth Amendment claim. In any case, even if the Court were to consider the Giglio claim separately, the Court would come to the same conclusion as in the Strickland context: that Petitioner cannot show any prejudice that came to him on the issue of Hill's testimony.

13

Cir. 1998) (citing Kyles v. Whitney, 514 U.S. 419, 431 (1995); Brady, 373 U.S. at 87). Included in the type of evidence the prosecution must disclose is "evidence that is useful for impeachment, i.e., having the potential to alter the jury's assessment of the credibility of a significant prosecution witness." Id. (citing Giglio v. United States, 405 U.S. 150, 154-155 (1972); Napue v. Illinois, 360 U.S. 264, 269 (1959)). As such, "'the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" Wearry v. Cain, 136 S.Ct. 1002, 1006 (2016) (quoting Brady v. Maryland, 373 U.S. 83, 87 (1963)). Material evidence is evidence where "there is 'any reasonable likelihood' it could have 'affected the judgment of the jury.'" Id. (quoting Giglio, 405 U.S. at 154). To prevail on such a claim, a defendant "need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted." Id. (quoting Smith v. Cain, 565 U.S. 73, 132 S. Ct. 627, 630 (2012)). Instead, the defendant need "show only that the new evidence is sufficient to 'undermine confidence' in the verdict." Id. (quoting Smith, 132 S.Ct. at 630).

Petitioner's motion to vacate fails in this respect as well. Counsel's alleged ineffectiveness came in failing to pursue the information contained in the filings in the Hill case. Petitioner's briefing indicates, however, that his complaint is not really with his counsel's conduct in failing to elicit information about Lloyd's allegedly false testimony in another case, but in the government's failure to provide that information to his counsel. In that sense, Petitioner does not complain about his counsel's conduct, but the conduct of the prosecutor. Moreover, the trial testimony indicates that counsel did seek to impeach Lloyd about his role in the Pennick case, but ultimately appeared to decide the material

14

was unhelpful. As explained above, deciding not to pursue that angle for cross examination did not constitute a failure to meet the appropriate standards of performance in this matter.

Even assuming that counsel could be found to have fallen below the appropriate standard in failing to pursue the alleged Brady violation, Petitioner would still not prevail on his motion. Petitioner contends that a jury would not have believed Lloyd's testimony with additional information about his alleged lies in another case. As explained above, the allegations in Pennick's motion were largely collateral to the evidence in this case and the motion remains pending. The only value would have been as a means of impeaching Lloyd. Additional impeaching information of dubious quality would not undermine confidence in the verdict. In that sense, even assuming that Petitioner could demonstrate that counsel fell below an objective standard of reasonableness in failing to demand the information contained in the Hill matter, Petitioner could not show the prejudice necessary for the Court to grant the motion to vacate on these grounds.

### C. Failure to Argue that Petitioner was Exempt from Reporting Requirements

Petitioner next argues that he was exempt from the reporting requirements for cash transactions of which he was convicted, and that his counsel was constitutionally deficient for failing to offer that argument. He points to the reporting statute under which he was convicted and argues the reporting requirements did not apply to him. He contends he only took checks for purchase of his vehicles. He argues his attorney was ineffective because he did not argue these grounds, which would have prevented his conviction.

The jury convicted Petitioner on four counts of failing to report certain transactions.

15

The statute the jury used in convicting Petitioner, 31 U.S.C. § 3551, provides, in relevant part:

> (a) Coin and currency receipts of more than $10,000.--Any person--
>     (1)(A) who is engaged in a trade or business, and
>     (B) who, in the course of such trade or business, receives more than $10,000 in coins or currency in 1 transaction (or 2 or more related transactions), or
>     (2) who is required to file a report under section 6050I(g) of the Internal Revenue Code of 1986, shall file a report described in subsection (b) with respect to such transaction (or related transactions) with the Financial Crimes Enforcement Network [FinCEN] at such time and in such manner as the Secretary may, by regulation, prescribe.
> (c) Exceptions.--
>     (1) Amounts received by financial institutions.--Subsection (a) shall not apply to amounts received in a transaction reported under section 5313 and regulations prescribed under such section.
>     (2) Transactions occurring outside the United States.--Except to the extent provided in regulations prescribed by the Secretary, subsection (a) shall not apply to any transaction if the entire transaction occurs outside the United States.
> (d) Currency includes foreign currency and certain monetary instruments.--
>     (1) In general.--For purposes of this section, the term "currency" includes--
>         (A) foreign currency; and
>         (B) to the extent provided in regulations prescribed by the Secretary, any monetary instrument (whether or not in bearer form) with a face amount of not more than $10,000.
> (2) Scope of application.--Paragraph (1)(B) shall not apply to any check drawn on the account of the writer in a financial institution referred to in subparagraph (A), (B), (C), (D), (E), (F), (G), (J), (K), (R), or (S) of section 5312(a)(2).

31 U.S.C. § 3551.

Petitioner argues that his conduct as proved at trial did not violate this section. He contends that he was exempt from reporting the transactions in question because they did not involve cash transactions of more than $10,000 and did not involve checks that triggered any reporting requirement. He insists that his trial counsel was ineffective because he did not offer any argument or propose any jury instructions that would have demonstrated that the exemptions applied to him.

Petitioner challenged his conviction in part on the grounds that he was exempt from reporting requirements in his appeal to the Second Circuit. The Second Circuit concluded:

> Robins's argument that he had no obligation to report the relevant transactions is unavailing. As to Count 17, Stevenson testified that he purchased the Yukon for $25,000 in cash, which plainly triggers § 3551. As to Count 19, although Robins avers that no report was required because he received an exempt $12,000 chashier's check, a trade in or a 2000 Cadillac worth $7,000, and other money in exchange for a $23,000 Mercedes, the jury could have inferred from Finish Line's inventory log that the "trade in" of the Cadillac concealed a $11,000 cash payment. As to Count 24, even accepting Robins's argument that some of the tender for the Infiniti was exempt from reporting, Lloyd testified to paying $16,000 in non-exempt currency which Robins was required to report to FinCEN. Finally, as to Count 25, concerning the sale of a 2006 Range Rover for $48,937.50, even accepting that Robins received an exempt $30,000 cashier's check, the sale agreement and dealership inventory log permitted the jury to infer that Robins received at least $18,000 in non-exempt currency for the car, triggering § 5331 reporting. Accordingly we conclude that the evidence was sufficient for the jury to find that each transaction should have been reported to FinCen.

United States v. Robins, 673 Fed.Appx. 13, 18-19 (2d Cir. 2016).

Petitioner's attempt to raise this argument as a section 2255 motion to vacate is precluded by case law. Courts are clear that "section 2255 may not be employed to relitigate questions which were raised and considered on direct appeal." Barton v. United States, 791 F.2d 265, 267 (2d Cir. 1986). Petitioner casts his motion as one alleging ineffective assistance of counsel, one of the exceptions to this rule. See id. The exception does not apply, however, since his appellate counsel raised the issue of whether Petitioner's conduct sufficed to prove a failure-to-report transactions, precisely the issue that Petitioner contends led to ineffectiveness by his trial counsel. Since the Court of Appeals considered and rejected Petitioner's position in this respect, he cannot use his motion to vacate to revive that baseless argument. The Court will deny the motion to vacate in this respect.

17

## IV. CONCLUSION

For the reasons stated above, the Court will DENY Petitioner's motion to vacate, dkt. # 256. Petitioner's motion for leave to file a memorandum of law in excess of the pages permitted by the local rules, dkt. # 257, is hereby GRANTED. Petitioner's motion for a bail hearing, dkt. # 265, which is predicated on the likelihood of the success of his motion to vacate, is hereby DENIED. As the Court has found the evidence in the record sufficient to address the motion to vacate, the Court will also deny Petitioner's motion for an evidentiary hearing, discovery pursuant to Rule 6(a) of the Rules Governing Section 2255 proceedings, and for appointed counsel. See dkt. # 266. Additional fact-finding would not alter the Court's conclusion that Petitioner's counsel made reasonable strategic decisions based on the information available at the time of trial, and that counsel's decision to limit cross-examination on Lloyd's credibility was not unreasonable even if the information Petitioner claims exists were available. Because the Court also finds that it is not debatable by jurists of reason that there is merit to the instant motion to vacate, the Court declines to issue a certificate of appealability.

DATED:  June 27, 2018

*Thomas J. McAvoy*
Thomas J. McAvoy
Senior U.S. District Judge

18